# MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P.C.

ELKAN ABRAMOWITZ
RICHARD F. ALBERT
ROBERT J. ANELLO*
KATHLEEN E. CASSIDY
BENJAMIN S. FISCHER
CATHERINE M. FOTI
CHRISTOPHER B. HARWOOD
LAWRENCE IASON
BRIAN A. JACOBS
TELEMACHUS P. KASULIS
KAREN R. KING
ROBERT M. RADICK*
JONATHAN S. SACK**
EDWARD M. SPIRO
JEREMY H. TEMKIN
RICHARD D. WEINBERG

565 FIFTH AVENUE
NEW YORK, NEW YORK 10017
(212) 856-9600
FAX: (212) 856-9494

www.maglaw.com

WRITER'S CONTACT INFORMATION

rradick@maglaw.com
kdrooyan@maglaw.com
rfeldman@maglaw.com
(212) 856-9600

SENIOR COUNSEL
PAUL R. GRAND

COUNSEL
JASMINE JUTEAU
CURTIS B. LEITNER

ROBERT G. MORVILLO
1938-2011
MICHAEL C. SILBERBERG
1940-2002
JOHN J. TIGUE, JR.
1939-2009

*ALSO ADMITTED IN WASHINGTON, D.C.
**ALSO ADMITTED IN CONNECTICUT

May 2, 2022

**BY ECF & EMAIL**
Honorable Allyne R. Ross
United States District Judge
United States District Court for the
 Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    <u>United States v. Ezhil Sezhian Kamaldoss et al.</u>, 19 Cr. 543 (ARR)

Dear Judge Ross:

      On behalf of our client Ezhil Kamaldoss, we respectfully submit this letter-brief in support of Mr. Kamaldoss's motions *in limine*.

      For the reasons set forth below, we respectfully submit that, during the forthcoming trial in this matter, the government should not be permitted to present evidence, testimony, or argument regarding the following topics.

      **1.**    **The Government's Assertion that Mr. Kamaldoss "Sanitized His Devices" Prior to the August 15, 2019 Border Search**

      In its memorandum of law in opposition to Mr. Kamaldoss's pre-trial motions, the government acknowledged that law enforcement agents performed border searches of Mr. Kamaldoss's electronic devices on April 23, 2019 and August 15, 2019. *See* Mem. of Law in Opp. to Defendants' Motions to Suppress, Dkt. 166 ("Opp.") at 4. With respect to the April 2019 border search, the government asserted that the search revealed communications regarding the distribution of controlled substances to individuals throughout the United States, as well as communications relating to international money transfers. *Id*. With respect to the August 2019 border search, the government stated that the search "was less fruitful," and the government inferred that the failure of the search to turn up evidence against Mr. Kamaldoss was because Mr. Kamaldoss "sanitized his devices" before arriving at JFK. *Id.* at 4-5.

MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P.C.

Honorable Allyne R. Ross
May 2, 2022
Page 2

The government should be precluded from asserting at trial that Mr. Kamaldoss "sanitized his devices" or otherwise improperly deleted materials from his electronic devices in advance of the August 2019 border search. As an initial matter, the government has agreed not to use at trial any materials that were seized from Mr. Kamaldoss's electronic devices pursuant to the August 2019 border search. *See id.* at 5 n.1. Considerations of fairness dictate that if the government is not going to be introducing at trial anything seized from Mr. Kamaldoss's devices in August 2019, it should not be permitted to comment at trial on the state of those devices when they were seized.

Moreover, the fact that the government did not find its August 2019 border search of Mr. Kamaldoss's devices to be "fruitful" (or at least not as allegedly "fruitful" as its April 2019 border search) does not mean that Mr. Kamaldoss improperly deleted relevant information from his devices. The government's suggestion that Mr. Kamaldoss "sanitized his devices" is unsupported by anything other than speculation. Further, if the government were permitted to assert or imply that Mr. Kamaldoss deleted information from his devices in order to prevent it from being available to government agents, it would suggest an adverse fact not at issue in this case: namely, that Mr. Kamaldoss was knowingly attempting to obstruct an ongoing investigation, which is a criminal offense that the government has neither alleged nor asserted at any point during the history of this matter. Additionally, the speculative assertion that Mr. Kamaldoss allegedly "sanitized" his devices between April 2019 and August 2019 would unfairly excite the jury to believe that Mr. Kamaldoss must have known that he was engaged in criminal activity and thus "wiped" or otherwise minimized the content of his devices in a manner that reflects consciousness of guilt, when in fact there is no other evidence to support such an assertion, nor even enough information by which the jury could compare the quantity of data on Mr. Kamaldoss's devices at the time of each search.

For these reasons, the Court should preclude the government from asserting that Mr. Kamaldoss "sanitized his devices" or otherwise improperly deleted relevant information from his electronic devices prior to the August 2019 border search, as any such assertion is without an adequate evidentiary basis, would create unfair prejudice, and would risk misleading the jury. *See* Fed. R. Evid. 403.

### 2. Mr. Kamaldoss's Statements During the August 2019 Border Search

The government should also be precluded from introducing at trial any statements that Mr. Kamaldoss made to law enforcement agents at JFK Airport on August 15, 2019.[1] In his pre-

---

[1] The statements that Mr. Kamaldoss made to agents during the August 15, 2019 border search are reflected in the report attached hereto as Exhibit A. Because this Exhibit A, as well as the documents annexed hereto as Exhibits B, C and E, have been designated by the government as "Sensitive" and/or "Attorneys' Eyes Only" pursuant to the protective order in this matter, we will not include those Exhibits in the version of the motion papers that we file on ECF, but will provide a full set of the Exhibits to the Court and to government counsel.

MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P.C.

Honorable Allyne R. Ross
May 2, 2022
Page 3

trial motions, Mr. Kamaldoss sought to suppress not only the contents of his electronic devices that were seized at JFK Airport in August 2019, but also statements that he made to law enforcement agents during that border search, on the ground that those statements were the product of an un-*Mirandized* custodial interrogation. *See* Mem. of Law in Support of Mr. Kamaldoss's Pre-Trial Motions, Dkt. 159 at 15-20. As noted earlier, in response to Mr. Kamaldoss's pre-trial motions, the government agreed not to use any evidence obtained from Mr. Kamaldoss's devices during the August 2019 border search. *See* Opp. at 5 n.1.

By agreeing not to introduce the electronic fruits of the August 15, 2019 border search, the government largely mooted the issue of whether Mr. Kamaldoss was in custody when he was detained at JFK Airport on that day, and the Court thus did not consider or rule upon whether the statements that Mr. Kamaldoss made while he was detained in August 2019 were in response to custodial interrogation. Given this backdrop, in which the government's concession about not seeking to admit evidence obtained on August 15, 2019 effectively prevented a determination regarding whether Mr. Kamaldoss was in custody, the government should not now be permitted to introduce any statements Mr. Kamaldoss made when he was interrogated during the course of this second border search.[2]

### 3. Evidence Obtained During the September 12, 2019 Search of the Premises at 161-15 Rockaway Boulevard in Queens, New York

On September 12, 2019, law enforcement agents executed a search warrant on what the government has described as a warehouse located at 161-15 Rockaway Boulevard in Queens, New York (the "Warehouse"). *See* September 6, 2019 Search Warrant.[3] Specifically, law enforcement agents searched several office suites at the Warehouse, including Suite 201-A. *Id.* The application for the search warrant alleged, based on lease documentation from February 2019, that Suite 201-A was being leased by Hosea Express, a company owned by Mr. Kamaldoss. *See* September 6, 2019 Search Warrant Application at ¶¶ 50-52.[4] However, at the time the search warrant was sought and obtained in September 2019, Hosea Express was no longer leasing or occupying Suite 201-A or any other office space at the Warehouse, as lease-

---

[2] In connection with this argument, we acknowledge the Court's finding that Mr. Kamaldoss was not in custody during the April 2019 border search, and we recognize that the Court may have reached a similar finding as to the August 2019 border search had the suppression hearing addressed that issue. However, given that the suppression hearing did not reach the August 2019 border search because of the government's decision not to offer evidence obtained that day, we respectfully submit that conclusions or inferences regarding the nature of the August 2019 border search should not be drawn at the present time.

[3] The September 6, 2019 Search Warrant is attached hereto as Exhibit B.

[4] The September 6, 2019 Search Warrant Application is attached hereto as Exhibit C.

MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P.C.

Honorable Allyne R. Ross
May 2, 2022
Page 4

related emails and documents confirm.  *See* Closing Statement from Rockaway Equities, transmitted by email from Rockaway Equities to Mr. Kamaldoss on September 4, 2019.[5]

Further, although materials produced in discovery indicate that during the September 12, 2019 search of the Warehouse, law enforcement agents seized various items, including documents, electronic evidence, and controlled substances, the government has represented to us that none of these materials were taken from Mr. Kamaldoss's former suite 201-A.

Because none of the items seized from the Warehouse were taken from the office suite that was previously leased by Hosea Express, the government should be precluded from attempting to use any of these items at trial as evidence against Mr. Kamaldoss, and a limiting instruction should be given to ensure that the jury does not incorrectly attribute such items to Mr. Kamaldoss.  Otherwise, permitting the government to introduce such evidence as if it belonged or related to Mr. Kamaldoss would create substantial risks of unfair prejudice, confusion of the issues, and misleading of the jury.  *See* Fed. R. Evid. 403.  In particular, the introduction of such evidence as against Mr. Kamaldoss would tend to lead the jury to conclude that the seized evidence belonged to Mr. Kamaldoss and his company, even though none of the evidence was taken from the Hosea Express offices, and neither Mr. Kamaldoss nor Hosea Express was still leasing office space at the Warehouse at the time of the search.

### 4. **The Alleged Involvement of Mr. Kamaldoss's Brother, Kamaldoss Vetri Selvam**

The complaint in this case, dated September 6, 2019, charged both Mr. Kamaldoss and his brother—Kamaldoss Vetri Selvam ("Mr. Selvam")—with conspiracy to distribute a controlled substance and conspiracy to commit money laundering.  *See* Sealed Complaint, Dkt. 2 ("Compl.") at 2-3.  Although the government later sought and obtained an indictment against Mr. Kamaldoss, the government dropped its case against Mr. Selvam.  Given that the charges against Mr. Selvam were dropped, Mr. Kamaldoss moves *in limine* to prevent the government from introducing any allegations of Mr. Selvam's supposed involvement in the offenses charged in this case, as such evidence would be unfairly prejudicial to Mr. Kamaldoss and would risk misleading or inflaming the jury in no less than two ways.

First, if admitted, evidence suggesting that Mr. Selvam was engaged in criminal activity would risk the jury inferring that if Mr. Selvam was engaged in illegal conduct, then because of their familial relationship, Mr. Kamaldoss was likely to have been engaged in criminal activity as well.  As a matter of logic and common sense, the fact that two people are siblings does not prove that they shared knowledge, intent, or participation in a criminal conspiracy.  Siblings may or may not choose to share information with each other for innumerable reasons, and an

---

[5] The Closing Statement, which is attached hereto as Exhibit D, reflects that no later than September 4, 2019, Mr. Kamaldoss had vacated Unit 201A at the 161-15 Rockaway Boulevard address.

MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P.C.

Honorable Allyne R. Ross
May 2, 2022
Page 5

individual's knowledge turns on what he perceives, not to whom he is related. In fact, merely because two siblings were co-defendants accused in the same complaint does not mean that they shared a common intent or that they acted in concert, especially when the charges against one of these siblings have been dismissed. Thus, any attempt by the government to introduce evidence of Mr. Selvam's alleged involvement in criminal activity would risk the jury transferring culpability from Mr. Selvam to Mr. Kamaldoss, thereby contravening the basic principle that each defendant's responsibility must be evaluated separately. *See Kotteakos v. United States*, 328 U.S. 750, 772 (1946) ("Guilt with us remains individual and personal[.]"); *Jefferson v. United States*, 340 F.2d 193, 197 (9th Cir. 1965) (it is improper to impute knowledge from one co-conspirator to another).

Second, any evidence the government may seek to introduce regarding Mr. Selvam's supposed involvement in criminal activity (which, again, is no longer being pursued given the government's dismissal of the charges against Mr. Selvam) will create a danger of unfair prejudice and may mislead the jury, because the jury may infer that Mr. Kamaldoss brought his brother into the alleged criminal conspiracy. Any such inference would unfairly excite emotions or inflame passions against Mr. Kamaldoss, as jurors may seek to hold Mr. Kamaldoss responsible for failing to shield his brother from alleged criminal conduct, or for supposedly enticing or luring his brother into such conduct.

In sum, there is neither a factual basis nor legitimate grounds for the government to introduce at trial any evidence relating to Mr. Selvam, and such evidence would present significant risks to the fairness of the trial against Mr. Kamaldoss. The Court therefore should preclude the government from offering any evidence that indicates, suggests, or implies that Mr. Kamaldoss's brother was involved in the offenses charged in this case.

### 5. "James Wills"

In the complaint, the government asserted that during the course of its investigation, on or about March 21, 2018, an undercover agent (the "UC") communicated with an individual who identified himself as "James Wills." Compl. at ¶ 5. Mr. Wills purported to work for an online pharmacy and expressed a willingness to sell various controlled substances in bulk shipments. *Id.*

Between approximately March 2018 and July 2018, law enforcement agents allegedly purchased controlled substances from Mr. Wills on several occasions, and did so through text message communications with Mr. Wills. *Id.* at ¶ 6. In the course of these text message discussions, Mr. Wills allegedly provided the UC with several United States Postal Service tracking numbers for packages that purportedly contained controlled substances. *Id.* at ¶ 7. Law enforcement agents seized these packages and, as alleged, found that they contained controlled substances. *Id.* at ¶¶ 8-9. The government further has alleged that on numerous seized packages, the word "Avenue" was misspelled in the return address labels because it was missing the letter

Morvillo Abramowitz Grand Iason & Anello P.C.

Honorable Allyne R. Ross
May 2, 2022
Page 6

"v." *Id.* at ¶ 10.  Later in the complaint, the government asserts that, on August 9, 2018, law enforcement agents observed Mr. Kamaldoss mail packages that bore the same return address as the packages obtained through Mr. Wills, including the same misspelling of the word "Avenue."[6] *Id.* at ¶ 15.

Here, although we do not necessarily anticipate that the government will attempt to argue that Mr. Kamaldoss is in fact Mr. Wills (as such an argument would generally be inconsistent with what we understand are the government's theories in this matter), the Court should in any case preclude the government from making any assertion or suggestion that Mr. Kamaldoss is in fact Mr. Wills.  We note in this regard that while the complaint implicitly suggests that there is a nexus between the alleged conduct of Mr. Wills and Mr. Kamaldoss—in that packages purchased through Mr. Wills contained the same return address (with the same typographical error) as a separate set of packages that were mailed by Mr. Kamaldoss—the complaint does not suggest that Mr. Kamaldoss was in fact the same person as the individual who used the name "James Wills".  Further, we are not aware of any indication from the evidence generally, let alone from the various electronic materials taken from Mr. Kamaldoss, that would give the government a good-faith basis for suggesting that (or even referencing any supposed uncertainty as to whether) Mr. Kamaldoss was in fact Mr. Wills.  As a result, allowing the government to suggest or even leave open the possibility that Mr. Kamaldoss is the same person as Mr. Wills would confuse the issues, be unfairly prejudicial, and would risk the jury assessing Mr. Kamaldoss's criminal liability based on conduct that, to our knowledge, the government does not have a good faith basis to attribute to him.

For these reasons, the government should be prohibited from offering any evidence or making any argument that Mr. Kamaldoss is or may be Mr. Wills.  Likewise, if necessary, the Court should provide an instruction to the jury that there is no allegation in this matter that Mr. Wills and Mr. Kamaldoss are the same individual.

### 6. Return Address on Packages That Mr. Kamaldoss Mailed in August 2018

On August 29, 2018, law enforcement agents allegedly observed Mr. Kamaldoss mailing five packages that, according to the government, were later determined to contain the controlled substances Tramadol and Alprazolam.  *See* Compl. at ¶¶ 16-17.  The packages all bore the return address "Andrew Fistel, 124-10 Metropolitan Aenue [sic] Suite #3."  *See* August 30, 2018 Search Warrant.[7]

---

[6] Although law enforcement agents allegedly observed Mr. Kamaldoss mailing these packages on August 9, 2018, none of those packages were seized.  It was not until August 29, 2018, when agents again observed Mr. Kamaldoss mailing packages, that they seized five such packages and subsequently searched them pursuant to a warrant.

[7] The August 30, 2018 Search Warrant is attached hereto as Exhibit E.

MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P.C.

Honorable Allyne R. Ross
May 2, 2022
Page 7

In its opposition to Mr. Kamaldoss's pre-trial motions, the government asserted that the 124-10 Metropolitan Avenue return address on the packages was "false." Opp. at 34.[8] Specifically, the government contended that, based upon internet searches and public records, the return address appears to correspond to a tile store in Kew Gardens. *See id.* at 34 n.5. To the extent that the government seeks to similarly assert at trial that this or any other return address appearing on packages mailed by Mr. Kamaldoss was "false" or otherwise was intended to conceal Mr. Kamaldoss's alleged involvement in criminal activity, the government should be precluded from making such an argument unless it can provide specific evidence showing that Mr. Kamaldoss *himself placed the return address on the envelopes,* and that Mr. Kamaldoss *knew at the time of the mailing* that the return address was "false". Absent such proof, Mr. Kamaldoss would be unfairly prejudiced by the implication that he was taking steps to conceal alleged criminal activity, and there would not be a sufficient factual predicate for the damaging inference that the government would be asking the jury to draw.

### 7. The Concealment Prong of the Money Laundering Conspiracy Charge

Count 10 of the Superseding Indictment charges Mr. Kamaldoss with participating in a money laundering conspiracy and identifies two forms of money laundering in which Mr. Kamaldoss allegedly engaged: (1) promotional money laundering; and (2) concealment money laundering. In connection with our assessment of potential pre-trial motions to be made in this case—and in particular, in order to assess and potentially obviate the need for a defense motion for a bill of particulars—we asked the government to explain its theory underlying the concealment prong of the money laundering charge. The government explained to us in response that the concealment aspect of the money laundering charge rests on Mr. Kamaldoss's alleged use of a hawala, which is an informal money transfer system, to make payments in a manner that was intended to conceal the location, nature, or source of the funds involved.

In two respects, the government's theory as to the alleged concealment money laundering in this case warrants *in limine* relief.

First, given the government's statement to defense counsel that its concealment money laundering charge will be premised on Mr. Kamaldoss's alleged use of a hawala-style system of money transfers, the government should be required to establish beyond a reasonable doubt that Mr. Kamaldoss used such a system of transfer *for the purpose of* concealing the nature, location, source, ownership, or control of the proceeds of a specified unlawful activity, and the government should definitively *not* be allowed to imply or assert that the use of a hawala is inherently suspicious or necessarily tied to criminal activity. As the Court undoubtedly is aware, a hawala transaction can take various forms, and as appears to be relevant here, can involve a scenario in which (1) a person in one country (the "payor") provides funds to a hawala dealer for

---

[8] The government's assertion that 124-10 Metropolitan Avenue is a "false" return address also is reflected in certain of the search warrant affidavits in this matter.

Morvillo Abramowitz Grand Iason & Anello P.C.

Honorable Allyne R. Ross
May 2, 2022
Page 8

the benefit of an individual (the "beneficiary") who is in a second country or region; (2) the first hawala dealer contacts a hawala dealer in the second country or region, who makes a journal entry reflecting the agreement of the first hawala dealer to owe the second hawala dealer the sum of money that the payor wishes to transfer; and (3) the second hawala dealer then makes a payment to the beneficiary, who is in the same country or region where the second hawala dealer also is located. This informal method of transferring funds dates back centuries and, in some countries, even pre-dates the existence of the traditional banking system, and the ancient origins of the hawala system contradict the notion that hawalas serve solely to facilitate criminal activity.[9] Indeed, while hawalas of course can under some circumstances be used for criminal activity (just as the formal banking system can), their operation outside of the formal banking system (as well as the fact that most American jurors will not be familiar with hawala exchanges) should not be used or permitted to suggest that hawala transfers are necessarily illegal or reflect an effort to commit money laundering. The government should therefore be precluded from making any such argument or suggestion in any form during the trial in this matter. Moreover, to avoid unfair prejudice to Mr. Kamaldoss, the Court should issue a limiting instruction to the jury indicating that hawala transfers of the sort upon which the government is basing its concealment money laundering theory are not inherently illegal, suspicious, or improper, and that, in order to find Mr. Kamaldoss guilty of concealment money laundering, the government must prove beyond a reasonable doubt that an alleged hawala-type transfer was used by Mr. Kamaldoss for the purpose of concealing those attributes of the funds that are identified in 18 U.S.C. § 1956(a)(1)(B)(i).

Second, to the extent that the government intends to offer (or tries to offer) any evidence or arguments at trial that would suggest a different theory of the concealment money laundering charge other than Mr. Kamaldoss's alleged use of a hawala-type system of exchange, the government should be precluded from doing so. As noted, at the time that Mr. Kamaldoss asked the government to explain its theory behind the concealment money laundering charge, Mr. Kamaldoss informed the government that he was considering making a motion for a bill of particulars pursuant to which the government would not only have to explain its theory behind the charge, but also would have to commit to the nature of the charge so that Mr. Kamaldoss would be sufficiently on notice of the basis of the allegations against him. As a result of the government proffering to Mr. Kamaldoss that the use of hawala-type transfers underlies its concealment money laundering allegations, Mr. Kamaldoss did not pursue a bill of particulars. Thus, although we currently have no reason to expect that the government would in fact attempt to change its theory of concealment money laundering, any effort to do so during the trial should be precluded based on considerations of fundamental fairness and due process. Moreover, because a shift in government theories would effectively constitute a constructive amendment of the indictment and would significantly hamper Mr. Kamaldoss's ability to defend against the money laundering charge, the Court should preclude the government from offering any evidence

---

[9] *See* Rosenbaum, Matthew J., "*A Paper Chase in a Paperless World: Regulating Informal Value Transfer Systems,*" 50 Colum. J. of Transnat'l L. 169, 173-74 (2011).

MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P.C.

Honorable Allyne R. Ross
May 2, 2022
Page 9

of concealment money laundering other than that which relates to Mr. Kamaldoss's alleged use of a hawala-type system.

### 8. Recordings In Tamil For Which Mr. Kamaldoss Has Not Received Draft Translations

On November 3, 2020, the government provided Mr. Kamaldoss with: (1) 23 recordings, which the government has indicated are consensual recordings made by a cooperating witness and which contain lengthy conversations in Tamil; and (2) draft translations corresponding to nine of those recordings. *See* November 3, 2020 Production Cover Letter.[10] On January 6, 2022, during a status conference with the Court, AUSA Nicholas Moscow stated in reference to the government's production of 3500 material and other discovery in advance of trial that the government would "try to prioritize the stuff that may be translated or otherwise difficult and get that out a little bit earlier." *See* Transcript of January 6, 2022 Status Conference at 14:15-16.[11] Further, by telephone call on April 27, 2022, counsel for the government advised us for the first time that the government (1) would seek to introduce into evidence each of the 9 recordings for which we had previously been provided draft transcripts; and (2) would not seek to introduce into evidence any of the recordings for which draft transcripts were not provided. We also currently understand, based on our discussions with the government, that while the government intends to introduce into evidence the entirety of each of the 9 recordings for which transcripts were prepared, the only portions of those recordings that the government expects to play for the jury during the trial are those for which draft transcripts have previously been produced in discovery.

As is the case with other representations the government has made to us (including, for example, those relating to the money laundering theory in this case), we have no reason to expect that the government will fundamentally alter its approach and seek to offer into evidence any additional recordings or transcripts beyond those referenced above. However, should the government in fact seek to alter its approach and offer into evidence any other recordings or transcripts, we submit that such recordings and transcripts should be excluded.

Under Federal Rule of Evidence 403, the court may exclude relevant evidence if its probative value is substantially outweighed by, among other things, undue delay. Here, should the government attempt to offer into evidence any of the recordings for which it did not provide Mr. Kamaldoss with draft translations, or any portions of the recordings that go beyond the sections for which we have draft translations, the government would cause undue delay and risk a postponement of the trial. Indeed, having just been informed as to which specific recordings the government will seek to introduce into evidence, Mr. Kamaldoss is already presented with a circumstance by which, either directly or through a translator, he must seek to confirm the

---

[10] The November 3, 2020 letter is attached hereto as Exhibit F.

[11] Excerpts from the Transcript of the January 6, 2022 Status Conference are attached hereto as Exhibit G.

Morvillo Abramowitz Grand Iason & Anello P.C.

Honorable Allyne R. Ross
May 2, 2022
Page 10

accuracy of the draft translations with which he has been provided thus far, and must also seek to confirm that no other portions of the recordings are relevant to the selected excerpts that the government intends to offer. Given the significant additional burden that would arise if a Tamil-speaking interpreter were also required between now and the start of trial to conduct a review of any further recordings or excerpts thereof—and given the difficulty that this would present to Mr. Kamaldoss in adequately preparing his defense—we submit that the Court should preclude the government from seeking to admit any of the recordings or portions thereof for which Mr. Kamaldoss has not yet received a draft transcript.

### 9. Testimony of a Forensic Accountant

Finally, during the January 6, 2022 status conference in this matter, AUSA Moscow stated that he saw no reason why the government could not provide the defense with a list of non-cooperating witnesses three to four weeks in advance of trial. *See* Ex. G at 16:5-8. Subsequently, on January 31, 2022, in response to a follow-up email in which defense counsel asked the government to identify when it would provide notices of any government witnesses whom it would seek to qualify as experts, AUSA Robert Pollack wrote that the only experts the government then anticipated were a linguist (for foreign language materials) and "perhaps a forensic accountant."

As of the date of this submission, we have not received notice from the government of its intention to offer the testimony of a forensic accountant at trial. Accordingly, the government should be precluded from offering such expert testimony. Permitting the thus-far unnoticed testimony of a forensic accountant would, at the very least, cause undue delay and risk a postponement of the trial, as Mr. Kamaldoss would not only need time to examine the forensic accountant's findings (which would presumably be based on a review of a voluminous number of documents), but also would need to consider retaining his own forensic accountant and conducting his own forensic review of extensive financial materials. In order to avoid this undue delay and prevent unfair surprise and prejudice to Mr. Kamaldoss, the Court should preclude the government from seeking to offer at trial the testimony of a forensic accountant.

### Conclusion

For the foregoing reasons, we respectfully request that the Court grant Mr. Kamaldoss: (1) the relief requested herein; (2) to the extent applicable, all relief afforded upon any *in limine*

MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P.C.

Honorable Allyne R. Ross
May 2, 2022
Page 11

motions made by counsel for Mr. Navaratnarajah; and (3) all such further relief as the Court may deem just and equitable.

                                                  Respectfully submitted,

                                                  /s/
                                            Robert M. Radick
                                            Katherine J. Drooyan
                                            Russell Feldman

Attachments

cc:    AUSA Robert Pollack (by ECF and email)
       AUSA Margaret Schierberl (by ECF and email)
       AUSA Nicholas Moscow (by ECF and email)